UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ROBERT A. MAHAFFY,

                           Plaintiff,         Case No. 09 Civ. 1593 (AKH)

    v.

THE CITY OF NEW YORK; THE NEW YORK     **AFFIDAVIT OF PLAINTIFF ROBERT**
CITY DEPARTMENT OF EDUCATION; BRONX   **MAHAFFY IN OPPOSITION TO**
AEROSPACE ACADEMY HIGH SCHOOL; and    **DEFENDANTS' MOTION FOR**
BARBARA KIRKWEG, in her official and individual **<u>SUMMARY JUDGMENT</u>**
capacities,

                         Defendants.
---------------------------------------------------------------x

STATE OF NEW YORK   )
                              ) ss:
COUNTY OF NEW YORK  )

       ROBERT MAHAFFY, being duly sworn, deposes and says:

       1.     I am the Plaintiff in the above referenced action which asserts claims of retaliation, selective enforcement and defamation against my former employer, Bronx Aerospace Academy High School ("Bronx Aerospace" or the "School"), the New York City Department of Education ("DOE"), the City of New York (the "City") (collectively "City Defendants") and Principal Barbara Kirkweg. I submit this affidavit in opposition to City Defendants Motion for Summary Judgment and Defendant Barbara Kirkweg's Motion for Summary Judgment. I have direct personal knowledge of the facts set forth herein, except where otherwise specifically noted.

       2.     I am a retired United States Air Force ("Air Force") Technical Sergeant and served with distinction in the Air Force for twenty years. I enlisted in the Air Force after graduating from high school in 1983 and served until my retirement in 2003. During the course

of my service with the Air Force, I was deployed around the world, which included deployments throughout Europe, Saudi Arabia, Qatar, United Arab Emirates, Southeast Asia and throughout the continental United States. Additionally, I participated in numerous combat missions, including Operations Desert Shield, Desert Storm, Desert Fox, and Iraqi Freedom.

3. On my final five performance reports, I was rated as: "The exception. Absolutely superior in all areas."

4. While serving in the Air Force, I earned an Associate's Degree from the Community College of the Air Force and a Bachelor's Degree in Professional Aeronautics with a certificate in Flight Safety from Embry Riddle Aeronautical University.

5. From 1986 through my retirement from the Air Force in 2003, I served as a supervisor and instructor in Flight Operations. As an instructor, I trained enlisted airmen that had recently graduated from technical school and were being indoctrinated into their respective units. The training that I delivered consisted of both classroom instruction and on the job training. During the course of my sixteen years as a supervisor and instructor, I averaged approximately ten to fifteen days of classroom instruction per year.

6. I retired from the Air Force in 2003 and obtained employment as a Crew Scheduler with JetBlue Airlines. As a crew scheduler, my job responsibilities were to ensure that the airline had a legal crew for every flight and adjusted the schedules to take into account any weather or mechanical failures.

7. After approximately two years in the Crew Scheduler position, I was promoted to the position of Flight Safety Data Analyst.

8. In or around the Fall of 2006, while still employed by JetBlue Airlines, I learned of the Air Force's Junior Reserve Officer Training Program ("JROTC"). Shortly thereafter, I filled out the appropriate paperwork and subsequently applied to become a JROTC instructor.

9. In November 2006, I was accepted into the Air Force JROTC program. The Air Force Captain who interviewed me for the program gave me an overall evaluation of "Outstanding" and "highly recommended" that I be accepted into the program.

10. In or around January 2007, I was nominated by the Air Force for an open Aerospace Science Instructor ("ASI") with Bronx Aerospace and interviewed for this position with Ms. Kirkweg, the Principal of the School, for this position.

11. During the interview with Ms. Kirkweg, I was told that the school was held in very high regard and that it stood out as the only Air Force JROTC school with one-hundred percent participation in the JROTC program. During the interview, Ms. Kirkweg explained the salary for this position to me. According to Ms. Kirkweg, Air Force JROTC instructors at Bronx Aerospace were paid approximately one-third more than the standard teacher's salary and that an ASI's salary was based on the rank that the individual attained at the time that they retired from the Air Force.

12. A few days after my interview, I received a phone call from Ms. Kirkweg offering me the position. I accepted the position immediately and began working in February 2007.

13. As an ASI, I was required to teach the Air Force JROTC curriculum to students assigned to the School. In addition to these duties, my responsibilities as an ASI included coordinating extra-curricular activities (such as drill meets, field trips, and arranging visitors and speakers to come to the School), conducting inspections of the students to ensure compliance

3

with the Air Force's and the School's uniform requirements, as well as keeping inventory of the Air Force JROTC uniform items and equipment.

14. In or around March 2007, Ms. Kirkweg promoted me to the position of Senior Aerospace Science Instructor ("SASI"). As SASI, I was responsible for administering the entire Air Force JROTC program at the School and ensuring that the program was being run in compliance with Air Force regulations. As SASI, I also supervised the four other ASIs employed by the School in addition to those duties assigned to ASIs described above.

15. As part of my appointment to the SASI position, Ms. Kirkweg told me that I would be paid additional compensation in return for the increased duties. Specifically, she told me that I would be approved for one hour of overtime (or per session pay) per day for performing the duties of the SASI position. This additional overtime pay amounted to approximately $39 per hour.

16. During the remainder of the 2006 – 2007 school year, I performed my job as SASI in an exemplary manner and Ms. Kirkweg frequently complimented me on my dedication to the School, the JROTC program and the students.

17. Similarly, during the Fall of 2007, I continued to perform my job duties in an exemplary manner and often received compliments from Ms. Kirkweg regarding my work performance.

18. Around the time that I began my employment with Bronx Aerospace, there were five ASIs in total, with TSgt. William McCoy having started only a few weeks after I began. The other ASIs included MSgt. Joseph Picone, TSgt. Bobby Williams, and TSgt. Robert Sidberry.

19. In or around April 2007, MSgt. Joseph Picone and TSgt. Bobby Williams resigned their employment with the School, effective at the end of that school year. While I was not privy to the circumstances of their resignation, I believe that Ms. Kirkweg forced them to resign as she often later referred to MSgt. Picone and TSgt. Williams as having been fired.

20. On February 1, 2008, I met with Georgina Appiah, a representative of the United Federation of Teachers ("UFT" or the "Union") and discussed with her the work schedule that I and the other ASIs had been assigned. During the course of this meeting, I notified Ms. Appiah that I and the other ASIs were assigned a daily schedule of approximately 7:00 a.m. to 4:00 p.m. and showed her a copy of my schedule, which reflected the same thing.

21. Ms. Appiah was surprised to learn of my schedule and told me that collective bargaining agreement between the DOE and the UFT limited a teacher's work day to 6 hours and 50 minutes.

22. Prior to my meeting with Ms. Appiah, I was unaware of whether the collective bargaining agreement's 6 hour and 50 minute schedule applied to me. When I had previously discussed with Ms. Kirkweg whether ASIs were regular teachers or provisional teachers, she had said that the collective bargaining agreement did not apply to me (or the other ASIs). Instead, Ms. Kirkweg said that we were making more money than any other teacher in the School and would work longer as a result.

23. At the end of my meeting with Ms. Appiah, she indicated that she would look into the matter and get back to me.

24. My meeting with Ms. Appiah occurred on a Friday and the next week, my schedule and the other ASIs' schedules were changed to a 6 hour and 50 minute schedule and the number of class periods that I was assigned to was reduced from approximately ten to five or six.

Shortly after I met with Ms. Appiah, I was copied on an email from Ms. Kirkweg to the Air Force stating that, because I filed a grievance with the Union, I was being removed from the SASI position and would be an ASI instead. As a result, I no longer had the additional responsibilities that came with the SASI position and was no longer pre-approved for an hour of overtime per day.

25. On February 5, 2008, Assistant Principal Mary Anne Mandell ("Ms. Mandell") conducted an observation of one of my classes. In my nearly one year of employment with the School prior to this date, I had never received a classroom observation. As my class period was starting, Henry Rey, a flight teacher at the School, handed me a DVD about the Tuskegee Airmen and told me that Ms. Kirkweg wanted all JROTC classes to watch this DVD in preparation for a visit from one of the Tuskegee Airmen. As a result the lesson plan that I had prepared for that class did not reflect the DVD that I showed during the first thirty minutes of my class period. I explained this to Ms. Mandell, but she responded that not having a lesson plan was an automatic unsatisfactory rating.

26. On February 12, 2008, I filed a grievance with my union seeking overtime pay for hours that I worked between January 28, 2008 and February 12, 2008 that exceeded the 6 hour and 50 minute schedule for teachers.

27. On March 24, 2008, I received a letter of reprimand regarding two instances of failing to report to my class on time. In a prior meeting with Ms. Mandell, and in a written statement, I explained that, on the first instance, I had attempted to obtain coverage for my class so that I could continue to meet with members of the Air Force that were visiting the School, but my email was not successfully transmitted. With respect to the second instance, I explained that I was late for this class because I was conducting an intervisitation with another teacher – as I

was instructed to do by Ms. Mandell – and did not realize that it was a double period and was only a few moments late to my class. Notwithstanding these legitimate explanations, Ms. Mandell still issued me a written reprimand.

28. On or about March 30, 2008, I, along with a number of other teachers at the School, sent a letter to parents of students enrolled at Bronx Aerospace advising them of a number of concerns related to the School and their children's education which we believed the parents had a right to know. While I did not draft the letter, I reviewed it prior to it being distributed to parents and agreed with its contents. Additionally, I assisted in the mailing of this letter by delivering approximately fifty stuffed envelopes to a post office near my home.

29. Between April 11, 2008 and April 14, 2008, I received three separate written reprimands from Ms. Mandell.

30. The first written reprimand was for using an incorrect code on grading sheets for students assigned to me for the marking period that had recently ended. At my meeting with Ms. Mandell, and in a written rebuttal, I explained to her that I used the code I did because I had been told to do so by the school's programmer and that, if anything, this was an honest mistake, especially in light of the instructions which accompanied the grading instructions which instructed me to use the code that I used. I also explained to Ms. Mandell that as soon as I learned of the error I offered to correct it, but the school's programmer told me that he would take care of it. Notwithstanding my explanation, Ms. Mandell still issued me a written reprimand.

31. The second written reprimand was for failing to attend a faculty conference on March 28, 2008. At my meeting with Ms. Mandell, and in my written rebuttal, I explained that I was not told that my attendance was required during this meeting because it occurred during the

professional period, which I had been told in the past was optional. Notwithstanding my explanation, Ms. Mandell still issued me a written reprimand.

32. The third written reprimand that I received on April 11, 2008 was for failing to attend an open school night on April 3, 2008. As I explained to Ms. Mandell in my meeting with her, and in my written rebuttal, I was unable to attend the open school night because I, along with my wife and infant daughter were sick. In fact, before I took the sick day, I notified Ms. Mandell via email and discussed this with her in a subsequent phone conversation where she advised me that "it should be fine," as long as brought in a doctor's note. I provided Ms. Mandell with a doctor's note attesting to this fact but she disregarded the note and gave me a written reprimand.

33. On May 9, 2008, I was notified by Ms. Mandell that my employment was being terminated effective May 23, 2008.

34. Ms. Mandell provided me with a letter dated May 3, 2008 outlining a number of reasons on which Ms. Kirkweg based her decision to fire me. While the letter said that all of the referenced documents were attached, I never received copies of the two written complaints regarding unprofessional behavior by my department chair (Ms. Mandell) or the two written complaints from the School's parent coordinator.

35. When Ms. Mandell notified me that my employment was being terminated, I was not provided with the option of resigning in lieu of a termination.

36. On May 9, 2008, the same day that I was notified of my termination, I notified TSgt. Sidberry and TSgt. McCoy that I had been told that I was being terminated effective May 23, 2008.

37. Effective Tuesday, May 13, 2008, I was instructed that my classes were being reassigned to TSgt. McCoy and TSgt. Sidberry and that I was assigned to hallway duty.

38. By that same day, students at the School had learned that my employment was being terminated as multiple students came up to me in the hallways and indicated that they had heard that I was terminated and then offered their condolences. Thus, it was common knowledge among the students and staff that my employment was being terminated.

39. On May 14, 2008, the New York Daily News published an article ("Daily News Article") about Bronx Aerospace referencing the Air Force's decision to place the School's JROTC program on probation.

40. In this article, Ms. Kirkweg made defamatory statements which indicated that I was responsible for $66,800 in unaccounted JROTC funds.

41. This was untrue as I always kept detailed and accurate records accounting for any expenditures related to the JROTC account and also I was never responsible for anywhere near that much money.

42. On more than one occasion, Ms. Kirkweg instructed me to make specific expenditures from the JROTC bank account for either School or JROTC related expenses.

43. On one occasion, Ms. Kirkweg instructed me to loan $2,000 to the School's gym teacher in order to cover what Ms. Kirkweg described as a payroll error.

44. On another occasion, Ms. Kirkweg instructed me to loan $3,000 to one of the other JROTC instructors who she said was experiencing financial hardships.

45. On yet another occasion, Ms. Kirkweg instructed me to pay more than $5,500 for the School's JROTC awards banquet (which was not an approved expense per the Air Force policy on expenditures) which Ms. Kirkweg told me was a reimbursement for transportation

expenses that Ms. Kirkweg claimed that the School had incurred on the JROTC's behalf during the prior school year.

46. Immediately after the Daily News Article was published, I was approached by numerous students that I had taught prior to my assignment to hallway duty who told me, in sum and substance, "Don't worry, we know you didn't take the money."

47. On May 15, 2008, I filed a grievance through the union because I was terminated in violation of the collective bargaining agreement. A hearing was held on June 16, 2008 and shortly thereafter, I was notified that my grievance had been denied.

Dated: September 24, 2010
New York, New York

_____
Robert Mahaffy

Sworn to before me this
24 day of September, 2010

_____
Notary Public

GREGORY N. FILOSA
Notary Public, State of New York
No. 02FI6210695
Qualified in New York County
Commission Expires August 24, 20 03